THOMPSON COBURN

*Thompson Coburn LLP*
*Attorneys at Law*

One US Bank Plaza
St. Louis, Missouri 63101
314-552-6000
FAX 314-552-7000
www.thompsoncoburn.com

May 7, 2004

A. Ben Foster
314-552-6460
FAX 314-552-7460
EMAIL afoster@
thompsoncoburn.com

VIA FACSIMILE AND HAND-DELIVERY

Ms. Elizabeth Pitrolo
Acting Chief, Real Estate Division
Department of the Army
St. Louis District, Corps of Engineers
1222 Spruce Street
St. Louis, MO 63103-2833

Re: Request for Final Decision Regarding U.S. Army Corps of Engineer's Revocation Relating to Seasonal/Non-Transient Camping under Commercial Concession Lease No. DACW43-1-95-17/Request for Final Decision Regarding Boat Storage Issues

Dear Ms. Pitrolo:

I. <u>INTRODUCTION</u>

Sullivan Marina and Campground, L.L.C., ("Sullivan Marina"), through undersigned counsel, hereby submits this request to reverse the U.S. Army Corps of Engineers, St. Louis District's ("St. Louis District"), revocation relating to seasonal/non-transient camping dated January 30, 2004, under Commercial Concession Lease No. DACW43-1-95-17 ("Lease"). Additionally, Sullivan Marina seeks a final decision with respect to the storage of boats on the concrete area near the entrance to the leased premises.

II. <u>FACTS</u>

A. <u>Background</u>

Pursuant to a Notice Availability ("NOA") dated August 17, 1994, the St. Louis District offered interested parties the opportunity to present proposals for the development of a commercial marina and related facilities at Lake Shelbyville, Illinois, at a location commonly known as Fox

Harbor.[1] (See Exhibit A, NOA.) Exhibit "C" to the NOA set forth the required minimum facilities as well as potential facilities that could be constructed as part of the marina and related facilities. Under the category of optional services that could be provided with approval, the NOA listed "[p]rovision of seasonal camping and non-transient trailer sites which meet applicable standards"("seasonal/non-transient camping"). (See Exhibit B, NOA, Exhibit "C," Section II.B.3.) No other types of camping were discussed in the NOA.

Sullivan Marina submitted its initial proposal in September 1994. In its proposal, Sullivan Marina offered seasonal/non-transient camping as discussed by the NOA. Additionally, Sullivan Marina based its profit calculations on an annual rate for such sites. In other words, camping units would remain on the premises throughout the year.

On December 22, 1994, the St. Louis District requested additional information from Sullivan Marina concerning its proposal. (See Exhibit C, letter to Sullivan Marina dated December 22, 1994.) Indeed, it was clear that the St. Louis District was requesting further information about elements of Sullivan Marina's proposal that were intended to be contractually binding. The St. Louis District asked Sullivan Marina to "verify and provide a listing" of the required minimum facilities "that you are committing to." Additionally, the St. Louis District asked Sullivan Marina to "provide a listing, including quantities, of all optional facilities to be provided and committed to." This was to be done as listed in the NOA, which, as discussed earlier, clearly provided for seasonal/non-transient camping. In response, Sullivan Marina indicated that it was committing to seasonal/non-transient camping that would be priced on an annual basis. (See Exhibit D, spreadsheet entitled "Campground & Cabin Projected Revenues 1995 through 1999.") As in its original proposal, Sullivan Marina made it clear that its profitability was based on an annual rate for such sites. (Id., noting that length of season was "annual.")

At no time while these discussions were occurring did the St. Louis District indicate that seasonal/non-transient camping, as discussed in the NOA and offered in Sullivan Marina's proposal, was not an approved activity or that Sullivan Marina's proposal was non-responsive for offering such an activity. Additionally, the St. Louis District failed to raise any issues with respect to Sullivan Marina's annual pricing of campsites.

During this time, discussions took place in which St. Louis District personnel indicated that seasonal/non-transient camping was an available activity. Specifically, Gary Camp, of the Management and Disposal Branch of the Army Corps of Engineers, St. Louis District, indicated that seasonal/non-transient camping was an available, approved activity. This arose in response to questions from Dennis Fayhee, an owner of Sullivan Marina, regarding the inclusion of a clause in the sample lease attached to the NOA that limited camping to no longer than 30 days in any 60 day consecutive period. (See Exhibit E, NOA, Exhibit "F," §32.) Mr. Camp indicated

[1] The original NOA was dated June 15, 1994 with submittal deadline of August 15, 1994. This date was extended to September 30, 1994 by the August 17, 1994 NOA. However, there were no substantive changes made to the August 17, 1994 NOA from the previous version.

that this clause did not apply because seasonal/non-transient camping was clearly offered. The St. Louis District never stated that it lacked the necessary approval for such an activity, or that it had no intention of obtaining any such approval in the future.

Lease No. DACW43-1-95-17 ("Lease") was executed by both parties in early March 1995. (See, Exhibit F, Lease.) The use and development of the leased property was to proceed in accordance with the Use and Development Plan attached to, and specifically incorporated by, the Lease. (See Exhibit F, Lease § 5.a.) With respect to the types of services that could be offered by Sullivan Marina, the Use and Development Plan tracked the terms set forth in the NOA. (See Exhibit G, Lease Exhibit "C.") Subpart A of the Use and Development Plan, set forth the services that Sullivan Marina *must* offer, and Subpart B set forth the services that Sullivan Marina *may* offer, with approval. The only type of camping that is contemplated by the Use and Development Plan is the "[p]rovision of seasonal camping and non-transient trailer sites which meet applicable standards," just as set forth in the NOA. (See Exhibit G, Lease Exhibit C, Section II.B.3.) In other words, camping other than seasonal/non-transient is neither a mandatory nor optional activity, and is not specifically contemplated by the Use and Development Plan.

The Five Year Plan, found in Section III of the Use and Development Plan, provides approval for many of the optional services listed in Section II.B of the Use and Development Plan. (See Exhibit G, Lease Exhibit C, Section III.) The Five Year Plan required Sullivan Marina to develop a certain number of campsites each year, thus providing approval for seasonal/non-transient camping. This is because, as stated above, seasonal/non-transient camping is the only type of camping activity that is even an option under the Use and Development Plan, and the approval found in Section III necessarily relates to seasonal/non-transient camping.

Pursuant to ER 405-1-12, Paragraph 8-149, which was in effect at the time the Lease was executed, camping for more than 30 days in any 60 consecutive days is generally not allowed. However, this restriction is waivable, and in order to obtain this exception, a request "must be forwarded for approval by the Division Engineer." See ER 405-1-12, Paragraph 8-149.

Apparently, the St. Louis District neglected to obtain approval for seasonal/non-transient camping from the Mississippi Valley Division before the Lease was executed. This may be attributable to the fact that the original NOA was published in June 1994, and the revised version of ER 405-1-12, Paragraph 8-149, was not implemented until September 1994. Thus, the St. Louis District may have been unaware that Division approval was part of the new regulations. Yet, at no time during the negotiation of the Lease did the St. Louis District indicate that it had not yet obtained approval from the Mississippi Valley Division, that it would not obtain such approval in the future, or that it never intended for seasonal/non-transient camping to be an approved activity under the Lease. Indeed, by including the option for seasonal camping and non-transient trailer sites in NOA, and by including this option in the Use and Development Plan

as the only type of available camping, the St. Louis District gave every indication that this was an approved activity.

Pursuant to the terms of the NOA, and the Lease's Use and Development Plan, Sullivan Marina has offered seasonal/non-transient camping since the inception of the Lease. This has included the presence of camping trailer units on the premises throughout the year.[2] Indeed, as stated in Sullivan Marina's proposal, and its price lists provided to the St. Louis District, campsites are priced on an annual basis, thus indicating that camping units would be present throughout the year.

Camping units remained present throughout the year until 1997 without any objection by the St. Louis District. Beginning with the July 1998 inspection, however, the St. Louis District began asserting that the presence of camping units was not permitted during the winter months and represented a Lease compliance issue. (See Exhibit H, July 30, 1998 Report of Compliance Inspection.) Subsequent to this, the St. Louis District also asserted that seasonal/non-transient camping was not an approved activity.

Sullivan Marina has consistently maintained that seasonal/non-transient camping and the presence of camping units throughout the year is part of the contract between the parties pursuant to the NOA, Sullivan Marina's proposal, the Use and Development Plan, and the course of performance subsequent to contract formation.

On June 2, 2000, the St. Louis District finally requested that the Mississippi Valley Division approve seasonal/non-transient camping at Sullivan Marina, and cured its failure to do so prior to execution of the Lease. (See Exhibit I, letter to Commander Mississippi Valley Division dated June 2, 2000.) This was not specifically requested by Sullivan Marina, as it maintained that seasonal/non-transient camping was already part of the Lease. In its request, the St. Louis District noted that this type of camping was offered by the previous concessionaire, and that Sullivan Marina "has continued this practice for the past five years." The St. Louis District also noted that "proper approval for extended stay camping has been a contentious issue between the District and the lessee." The St. Louis District request also included storage of camping units during the winter months. The St. Louis District referred to seasonal/non-transient camping as "extended stay camping beyond the currently authorized period."[3]

Approval from the Mississippi Valley Division was granted on June 21, 2000 pursuant to the St. Louis District's request for seasonal/non-transient camping at Sullivan Marina. (See Exhibit J, letter to St. Louis District dated June 21, 2000.) This cured any failure to request approval from the Mississippi Valley Division that may have occurred. Division approval of seasonal/non-

---

[2] It should be noted that neither the Lease nor applicable regulations set forth a camping season. The St. Louis District has imposed a camping season that runs from April 1st to October 31st of each year.
[3] The St. Louis District has consistently referred to seasonal/non-transient camping as "extended stay" camping. However, the Lease does not use the term "extended stay camping."

transient camping was given "within the scope of the existing 'Use and Development Plan'." Additionally, the Mississippi Valley Division stated that "permanent habitation or the appearance of permanent habitation" was prohibited.

After approval from Division was received, the St. Louis District sent a letter to Sullivan Marina on June 28, 2000 to "clarify provisions for extended stay camping (i.e., seasonal and non-transient camping) and storage of camping units (i.e. trailers and recreational vehicles) as provided for in the Commercial Concession Lease for Sullivan Campground and Marina, L.L.C., Contract Number DACW43-1-95-17." (See Exhibit K, letter to Sullivan Marina dated June 28, 2000.) The St. Louis District also stated that seasonal/non-transient camping pertained to full hook-up sites. This letter confirmed that seasonal/non-transient camping was "provided for" in the Lease as interpreted by the St. Louis District. This letter did not require that all personal property must be removed by November 1st of each year, or that all camping units must be disconnected from utilities by that time as well.

B. The Current Issues

On June 9, 2003 the St. Louis District stated that it intended to impose a "100% compliance" standard with respect to the presence of personal items and utility connections when it inspected Sullivan Marina's operations after October 31, 2003. In other words, all personal property with the exception of the camping units themselves was to be removed, and all camping units were to be disconnected from utilities in order to pass inspection. (See Exhibit L, letter to Sullivan Marina dated June 9, 2003.) Similar language accompanied the compliance inspection results that were provided to Sullivan Marina on August 13, 2003. (See Exhibit M, letter to Sullivan Marina dated August 13, 2003.) On October 22, 2003 the St. Louis District reiterated its intent to impose a 100% compliance standard. (See Exhibit N, letter to Sullivan Marina dated October 22, 2003.) Sullivan Marina had been inspected many times in the past, but a 100% compliance standard had never been strictly enforced.

Subsequently, on October 28, 2003, Sullivan Marina, acting through counsel, voiced its opposition to the 100% compliance standard, and informed the St. Louis District that it felt that the standard was unreasonable. (See Exhibit O, letter to St. Louis District dated October 28, 2003.) However, Sullivan Marina stated that it would do its best to cooperate with the St. Louis District's requests.

The St. Louis District conducted an inspection on November 4, 2003, just three days after the camping season had closed. Because the inspection was conducted so soon after the end of the season, many of Sullivan Marina's customers had not removed personal items and disconnected their camping units from utilities. The St. Louis District then prepared a list of sites that it felt were in violation of its imposed standard, which it then forwarded to Sullivan Marina's attention. (See Exhibit P, letter to Sullivan Marina and attached field notes dated November 14, 2003.) The St. Louis District also stated that it would re-inspect on December 15, 2003, and that it

expected 100% compliance at this time. An inspection was held on December 15, 2003, but no immediate action was taken by the St. Louis District.

During this time, time Sullivan Marina was working with its customers to coordinate the disconnection of utilities and the removal of personal property. Towards this end, Sullivan Marina, acting through counsel, provided the St. Louis District with letters on January 14, 2004 and again in January 21, 2004 stating that additional items of personal property had been removed. (See Exhibits Q and R, letters to St. Louis District dated January 14 and January 21, 2004.)

Pursuant to a letter dated January 30, 2004, the St. Louis District revoked Sullivan Marina's right to have camping units present from November 1st to March 31st of each year. (See Exhibit S, letter to Sullivan Marina dated January 30, 2004.) The St. Louis District's revocation acknowledge Sullivan Marina's letters of January 14, and 21, 2003, but stated that as of the December 15, 2003 inspection date, Sullivan Marina had not been in compliance with the St. Louis District's imposed standard.

The January 30, 2004 letter also stated that Sullivan Marina must cease the practice of storing large boats on the paved concrete area near the entrance to the marina and campground. On February 23, 2004 Sullivan Marina, acting through counsel, stated that this had been its practice for many years, as well as that of the other Marina's in the area, and requested that it be permitted to continue storing large boats in this manner. (See Exhibit T, letter to St. Louis District dated February 23, 2004.) Additionally, Sullivan Marina stated that storage of large boats in the unpaved storage area was impractical because of their weight, and was a safety concern due to the danger of tipping. Indeed, while there had been a modification to the lease dated February 16, 2000 that created a storage area, the modification language was permissive rather than mandatory, and did not require that all boats be stored in that area. (See Exhibit U, Lease Modification dated February 16, 2000.) In its subsequent response, dated March 17, 2004, the St. Louis District stated that the modification required that all boats be stored in the storage area, and that Sullivan Marina could request permission to pave the storage area to accommodate large boats. (See Exhibit V, letter to Sullivan Marina dated March 17, 2004.)

## III. LEGAL ANALYSIS

### A. The St. Louis District's revocation was arbitrary and capricious.

#### 1. Sullivan Marina was in substantial compliance with the St. Louis District's request on December 15th, 2003.

According to the St. Louis District's letter of January 30, 2004, a total of ten campsites contained personal items, and one site was still connected to utilities as of the December 15, 2003

inspection. (See Exhibit S, letter to Sullivan Marina dated January 30, 2004.) Assuming for the moment that each of these campsites was, in fact, objectionable, this means that 135 sites, or 93% of the campgrounds 145 full hook-up trailer sites, were in compliance with the St. Louis District's request regarding personal property and utilities. In other words, less than 7% of the total campsites were objectionable to the St. Louis District. There is no doubt that this constitutes substantial compliance with the St. Louis District's requests.

When these ten campsites are scrutinized, however, it becomes apparent that the issues cited by the St. Louis District are *de minimus* at best. The following sites were not in compliance according to the St. Louis District:

- Site A2 contained a "small carpet" and was connected to utilities. This site, however, is utilized by Sullivan Marina as discussed below.
- Site A3 contained a small portable BBQ grill, but was otherwise vacant with no camping unit present.
- Site G2 was found in violation as the result of "wooden steps" and a "teki torch." The "teki" torch is not clearly visible in the photographs provided by the St. Louis District, and several small wooden objects appear to be the steps noted by the inspectors. (See Exhibit W, letter and attached photographs dated February 10, 2004.)
- The camping unit at G3 had an air conditioning unit that the inspectors felt gave the appearance of permanent habitation. This is the standard air conditioner that accompanies the camping unit, and attaches to the bottom of the camping unit for transportation.
- Site J1 is utilized by Sullivan Marina as discussed below.
- Site J5 contained a small set of steps.
- Site J7 contained a few small pieces of incidental lumber characterized by the inspectors as pallets or deck parts.
- Site K8 was found in violation as a result of a lawn mower and other small personal property items. These items were stored in an orderly fashion on a small storage shelf that is directly attached to the side of the camping unit.
- Site P8 contained small pieces of scrap lumber and a few cinder blocks. The site was otherwise vacant, and did not have a camping unit present.
- Site P9 contained three tarps, a propane tank, a battery, and firewood. The propane tank was directly attached to the camping unit's trailer hitch, and it is a common practice to store external propane tanks in this manner.

Clearly, major items of personal property were not present, and those that were present are best described as items of scrap lumber and camping unit accessories. At the very worst, these items are campground maintenance issues, not breaches of contract warranting the revocation of an important contractual right.[4] Given that the overwhelming majority of Sullivan Marina's sites were in compliance, enforcement of this "white glove" inspection procedure is unjustified.

Additionally, a significant number of the items forming the basis of the revocation were not specifically cited in the St. Louis Districts field notes taken during the November 4, 2003 inspection, which purported to give Sullivan Marina notice of the items that needed to be removed by December 15, 2003. These include: (1) small carpet at site A2; (2) BBQ grill at site A3; (3) wooden steps and teki torch at site G2; (4) three tarps, a propane tank, battery and firewood at site P9; and, (5) pallets under the trailer and deck parts at site J7. (See Exhibits P and S, letter to Sullivan Marina and attached field notes dated November 14, 2003 and letter to Sullivan Marina dated January 30, 2004.)

As noted above, two of the sites, A3 and P8, did not even have camping units present at the time of the December 15, 2003 inspection. It is unclear how these two sites could give the appearance of permanent habitation based simply upon the presence of a few incidental items (a BBQ grill and pieces of deck or cinder blocks).[5]

Finally, two of the sites, A2 and J1, are utilized by Sullivan Marina for purposes incidental to the Lease. In the past, the St. Louis District has contended that the two camping units owned by Sullivan Marina are in violation of Section 32.b. of the Lease that prohibits the occupying of lands, buildings, vessels or other facilities within the premises for the purposes of maintaining a full or part time "residence." However, neither of these two trailers are used as "residences," but are used by employees of Sullivan Marina for purposes directly related to operation of the marina and campground such as when seasonal activities or special events require overnight stays. This is a common occurrence during the peak season, and infrequent occupation for purposes related to the operation of the marina and campground certainly does not quality as establishing a residence. Indeed it should be noted that the Lease itself provides that "[t]he premises may be occupied and used by the Lessee or duly authorized agents…solely for the conduct of business in connection with the recreational development of the premises for the general use of the public." (See Exhibit F, Lease Section 5.a.)

While the St. Louis District makes reference to persistent non-compliance in its January 30, 2004 letter, this statement loses sight of the fact that a very small number of the total campsites were

---

[4] Indeed, as discussed in § A2, the Lease, which creates the legal relationship between the parties, does not specifically address the items noted during the inspection of December 15, 2003.
[5] The St. Louis District has cited this policy rationale as the reason that all personal property must be removed from campsites by October 31, 2004. While the St. Louis District has often referred to its policy against evidence of "private exclusive use", this language is absent from the Lease and the various approvals for seasonal/non-transient camping, as discussed in Sections A.2 and A.3, below.

not in compliance as of the December 15, 2003 inspection. Indeed, the January 30, 2004 revocation letter seems to suggest that the current revocation may be the result of past inspections. However, the Army Corps of Engineers' own regulations prohibit such an approach, and state that "[p]atterns of repeated violations, even if for the same compliance issues, can not be cumulated to a greater non-compliance status than that warranted by the year's report." See ER 405-1-12, Paragraph 8-99. f. (1). According to the St. Louis District's letter of August 13, 2003, "[t]he Marina and campground has been given a satisfactory rating" for 2003. (See Exhibit M, letter to Sullivan Marina dated August 13, 2003.) Contrary to the statement made in the January 30th letter of revocation, this satisfactory rating was not qualified, and did not state "with the exception of the conditions for extended stay camping."[6] (See Exhibit S, letter to Sullivan Marina dated January 30, 2004.) Thus, any action taken by the St. Louis District should have been commensurate with the specific alleged violations found on December 15, 2003, and not the product of alleged past violations. Given that Sullivan Marina was in compliance for 2003, there is no justification for revocation of an important contractual right even if the St. Louis District has been unsatisfied with past inspections.

Thus, when the small number of allegedly objectionable sites are closely analyzed, it becomes clear that the St. Louis District's finding were in error. Thus, there is no justification for the extraordinary action taken against Sullivan Marina.

2. The 100% compliance standard has no basis in the Lease or applicable regulations.

The 100% compliance standard imposed by the St. Louis District is completely absent from the Lease and applicable regulations. Given Sullivan Marina's substantial compliance by Decmeber15, 2003, and the complete lack of specific authority to impose a categorical, 100% compliance standard, the St. Louis District's revocation of Sullivan Marina's right to have camping units present throughout the year was arbitrary and capricious, and completely without a basis in law.

Indeed, the St. Louis District's unilateral imposition of these terms demonstrates that it has lost sight of the fact that Sullivan Marina was granted a lease as opposed to a mere license. A lease conveys a possessory interest in real property, that creates a contractual relationship between the parties with specific rights and responsibilities. ER 405-1-12, Paragraph 8-102. a. "Generally, the lessee may occupy and use the premises for any lawful purpose not injurious to the

---

[6] Under the heading of "Questionable Compliance," the inspection form provided on August 13, 2003 states that in the past there had been evidence of private exclusive use, and that Sullivan Marina must remind its customers that "campsite improvements" that give the indication of private exclusive use must be removed by October 31st of each year, with 100% compliance. (See Exhibit M, inspection compliance form dated July 11, 2003.) However, there is no language stating that the "satisfactory" rating was otherwise qualified or conditional. It should be noted that the items discussed in the inspection results included "decks, outbuildings, playground equipment, landscaping, skirtings, awnings, and elaborate extensions to campers," not small and incidental items of personal property of the kind cited by the St. Louis District on the December 15, 2003 inspection.

reversion." Id. Moreover, "the lease may contain ***express*** provisions or conditions restricting the use of the property" by the lessee. Id. (emphasis added.) However, there are no express provisions containing the restrictions the St. Louis District has imposed in this case. (See Lease, Exhibit F.)

The compliance inspection "is the vehicle for enforcing the grantee's obligations and responsibilities ***as set out in the outgrant document***." ER 405-1-12, Paragraph 8-99. a. (emphasis added.) Moreover, the "outgrant document establishes a legal relationship with the grantee. No other inspection is authorized to determine compliance." ER 405-1-12, Paragraph 8-99. a. As stated earlier, the St. Louis District's requirements regarding personal property, utility connections, and the 100% compliance standard are not supported by the Lease.[7]

If anything, the Army Corps of Engineers' own regulations implore moderation and warn against an overly-technical approach to compliance inspections. For instance, ER 405-1-12, Paragraph 8-99 d.(3) cautions against a "preoccupation" with compliance inspection checklists that can obscure the true purpose of inspections "which is good management of the land under [the Corps'] jurisdiction and compliance by the grantee with the terms of use." Moreover, even when health and safety concerns involving "imminent danger" are present, the regulations urge a moderate approach and state that "[s]pecial care should be taken to comply with rights of the grantee under the outgrant." ER 405-1-12, Paragraph 8-99 e.(2)(a). If such moderation is appropriate when public safety is involved, it is certainly appropriate under the current circumstances involving minor campground maintenance issues.

The various boards of contract appeals have made it clear that the government is not entitled to strict compliance with an inspection standard not contained in the contract. For instance, before the government can exercise contractual remedies as the result of alleged deficiencies, it first "must have conducted the inspections in accordance with the contract terms." Hart's Food Service, Inc., ASBCA No. 30756, 89-2 BCA ¶ 21,789 (holding that where government inspections did not adhere to the terms of the contract, and no modification for the change in procedure was executed by the parties, the government was not entitled to make deductions based upon the extra-contractual inspection procedures). In other words, an "ad hoc inspection system" that is not in conformance with the contract is unreasonable. Hul-Hazard, Inc., ASBCA No. 34,645, 90-3 BCA ¶23,173. Moreover, government inspectors have been admonished for the "overzealous" pursuit of perfection when they attempt to apply inspection standards that are not set forth in the contract. W.F. Kilbride Construction, Inc., ASBCA No. 19,484, 76-1 BCA ¶ 11,726.

Confusing and vacillating inspection standards are not to be condoned, particularly where the contractor "is subjected to multiple inspections to differing standards by different officials...." Id. In this case, Sullivan Marina has been inspected many times since the inception of its Lease

[7] Indeed, as stated earlier, a camping season after which items must be removed and camping units disconnected is not set forth in the Lease document.

in 1995. However, during that entire period, this is the first instance that a 100% compliance standard has been enforced. Indeed, based upon past inspection practices, there was an expectation that substantial compliance would be acceptable.

Thus, the St. Louis District's imposition of a 100% compliance standard was a marked departure from the parties' past dealings under the Lease. Indeed, the conduct of the parties' established that substantial compliance was the accepted inspection standard. Thus, the St. Louis District is prohibited from imposing a more stringent 100% compliance standard. See J.R. Cheshier Janitorial, ENBCA 5487, 91-3 BCA ¶ 24, 351 (noting that the government may waive an inspection requirement if it accepts a lower standard over a period of time).

The 100% compliance requirement was conceived by the St. Louis District years after the NOA was prepared and after the Lease was awarded. Thus, the mechanical application of the arbitrary and extra-contractual 100% standard is even more objectionable because it was not part of the contractual negotiations between the parties. See generally Building Maintenance Specialist, Inc., ENGBCA No. 4115, 83-2 BCA ¶ 16,629 (finding that "the method of inspection and standards for acceptance were conceived after award; they were not available to prospective builders," and holding their application to be arbitrary and capricious).

The St. Louis District's 100% compliance standard fails to leave room for the exercise of any discretion at all, and the presence of one small item at one campsite would be the grounds for some contractual action. Moreover, the St. Louis District has failed to articulate a reasonable basis for its 100% compliance standard. Issues of public safety were not involved in the current situation, and there is no showing that time was of the essence to correct these issues. Thus, the incidental presence of a small number of items at 10 total campsites clearly has minimal impact on the interests of the government.

Given this minimal impact, there were less drastic alternatives available to the St. Louis District than revocation of camping-unit storage for the entire campground. More specifically, the St. Louis District could have taken action with respect to the few sites that it found to be out of compliance rather than arbitrarily revoking camping unit storage for the 93% of sites that the St. Louis District actually found to be compliant. In this sense, the St. Louis District's revocation was unnecessarily punitive both to Sullivan Marina and the vast majority of its customers.

As previously noted by Sullivan Marina , individual campers are responsible for the placement of items at campsites, and they did not always remove these items as expeditiously as both the St. Louis District and Sullivan Marina would have liked. Army Corps of Engineers' regulations specifically state that "the registered user of a campsite, picnic area or other facility shall be presumed to be responsible for its use." 13 C.F.R § 327.1 (i). The regulations further state that the proper remedy is "to issue a citation for the violation" pursuant to 13 C.F.R. § 327.25, which provides for the imposition of fines. See 13 C.F.R. § 327.1 (i); 13 C.F.R. § 327.25 (a). Issuing citations to the limited number of campsite users that the St. Louis District found to be in

violation would have been the least restrictive alternative, and would have avoided the improper revocation of Sullivan Marina's contractual rights.

3. Neither the Mississippi Valley Division's approval nor the St. Louis District's approval contain the 100% compliance standard.

Sullivan Marina has consistently maintained that, as a function of the optional activities offered in the NOA, Sullivan Marina's proposal, and the Use and Development Plan of the Lease, seasonal/non-transient camping has always been part of the contract between the parties. The St. Louis District, however, has cited written approvals from the Mississippi Valley Division and the St. Louis District from June 2000 as the ultimate source of Sullivan Marina's right to offer seasonal/non-transient camping. Even if this is assumed to be correct, neither of these documents provides support for the St. Louis District's imposition of the 100% compliance standard.

The standards set forth in the Mississippi Valley Division's approval of seasonal/non-transient camping do not specifically address the items of personal property cited during the December 15, 2003 inspection or the disconnection of utilities. Indeed, the Mississippi Valley's approval does not focus on the incidental presence of a few items of personal property as the St. Louis District has, but instead requires a "prohibition against permanent habitation and or the appearance of permanent habitation" examples of which include landscaping, skirting, mailboxes, wheels or axles removed. (See Exhibit J, letter to St. Louis District dated June 21, 2000.) A 100% compliance requirement is completely absent from this document.

Contrary to the St. Louis District's January 30, 2004 letter, the District's approval letter of June, 28, 2000 does not require that all personal property, except for recreational camping units themselves must be removed, and all camping units must be disconnected by October 31 of each year. With respect to the issue of personal property, the St. Louis District's letter of June 28, 2000 states that campsites "shall not be used for full or part-times residency" and must not have improvements such as: (1) mailboxes; (2) landscaping; (3) wheels or axles removed; or, (4) "any other features that would give the appearance of ***permanent*** habitation." (emphasis added.) (See Exhibit K, letter to Sullivan Marina dated June 28, 2000.) Of the violations cited during the December 15, 2003, inspection, there were no examples of mailboxes, landscaping or wheels or axles removed. Thus, the 10 sites that the St. Louis District found to be in violation must, necessarily, fall within the forth category, and be examples of features that give the appearance of "permanent habitation." However, as discussed earlier, the items noted during the inspection are incidental items of personal property that do not, under any application of the standard, give the appearance of "permanent habitation." At worst, these are campground maintenance issues, and do not violate the specific terms of approval from the Mississippi Valley Division and the St. Louis District.

Indeed, the St. Louis District's 100% compliance standard is not consistent with the policy behind the inspection requirement. The St. Louis District has stated that personal items cannot be present because they may give the appearance of permanent habitation. However, many of these items can remain on-site, according to the St. Louis District, before November 1st of each year, and return on April 1st of the next year. If they do not give the appearance of permanent habitation before November 1st, it is doubtful that they would afterwards. Moreover, during the winter months, there are very few visitors to Sullivan Marina, and it is not clear how the few items noted by the St. Louis District could conceivably impact the public's perception of Sullivan Marina's operations.

Simply stated, the St. Louis District has employed inspection requirements that are absent from the Mississippi Valley Division's approval, as well as its own approval, to revoke an important contractual right. Neither of the pertinent approval letters state that all personal property must be removed by October 31st of each year, or that all camping units must be disconnected with 100% compliance required. (See Exhibits J and K, letter to St. Louis District dated June 21, 2000 and letter to Sullivan Marina dated June 28, 2000.) The St. Louis District cannot use these approvals as a basis for revocation when Sullivan Marina has not violated their specific terms. The failure to apply standards in a consistent manner, and the imposition of stringent *ad hoc* requirements is arbitrary and capricious, and the resulting revocation is therefore improper. See § A.2., above.

4. Throughout the process, Sullivan Marina expressed its willingness to cooperate with the St. Louis District.

Throughout the process, Sullivan Marina cooperated with the St. Louis District. Moreover, Sullivan Marina was given a satisfactory rating for 2003 when the inspection occurred. As noted in prior correspondence, it is individual campers that are responsible for the placement of items at campsites, and they did not always remove these items as expeditiously as both the St. Louis District and Sullivan Marina would have liked. (See Exhibit O, letter to St. Louis District dated October 28, 2003.) Thus, the presence of personal items is very much a public/customer relations issue that is best resolved through the patience and cooperation of the parties.

It should be noted that the items were removed, and all camping units disconnected, before the St. Louis District sent its revocation letter dated January 30, 2004. The St. Louis District has not been prejudiced by the additional time it took to remove a very small number of items after December 15, 2003, and the revocation serves no legitimate purpose.

Moreover, the current revocation is neither in the public's nor the St. Louis District's best interests. Undoubtedly, there is a public demand for this service, and if the revocation is not reversed, Sullivan Marina's customers will be forced to seek other camping options which allow their camping units to be present throughout the year. Moreover, as more fully explained later, Sullivan Marina will incur significant damages if its right to have camping units present from

November 1st through March 31st of each year is revoked. As a result, its profits will drop dramatically, as will the rent collected by the St. Louis District.

B. <u>Sullivan Marina will incur significant breach of contract damages if the decision is not reversed.</u>

Since its inception, Sullivan Marina has offered its customers the ability to have their camping units present in the campground throughout the year, as an integral part of seasonal/non-transient camping, and pursuant to its understanding of the terms of the Lease. Indeed, Sullivan Marina's proposal to the St. Louis District's NOA provided that full hook-up sites were priced on an annual basis, and that camping units would remain at the campground throughout the year. These terms were accepted without objection by the St. Louis District. The practice and course of performance of the parties, and the St. Louis District's own interpretation of the Lease, confirm that seasonal/non-transient camping and the presence of camping units during the year is a contractual right.

Despite the fact that discussions were held regarding Sullivan Marina's proposal, the St. Louis District failed to question Sullivan Marina's annual pricing structure prior to execution of the Lease. Indeed, the St. Louis District requested "clear information concerning all income and expenses" in its December 22, 1994 letter seeking additional information about Sullivan Marina's proposal. (<u>See</u> Exhibit C, letter to Sullivan Marina dated December 22, 1994.) The St. Louis District also requested "information concerning necessary expenditures and projected profits for the proposed campground." (<u>Id.</u>) The text of the letter clearly indicated that the St. Louis District intended Sullivan Marina to be bound by the terms it was offering. Sullivan Marina's response reiterated that seasonal/non-transient camping was on an annual basis and that its profit projections were based on an annual occupation of these sites. (<u>See</u> Exhibit D, spreadsheet entitled "Campground & Cabin Projected Revenues 1995 through 1999.") Knowing that profitability was based upon an annual rate, the St. Louis District had a duty to inform Sullivan Marina if its proposal was non-responsive based upon such a projection. The St. Louis District's failure to do so clearly indicates that it approved of Sullivan Marina's annual pricing structure for seasonal/non-transient camping, and the proposal was deemed responsive. <u>See</u> ER 405-1-12, Paragraph 8-157. c.(4) ("District Engineers will select the responsive and responsible Applicant who submits the best acceptable application.")

The conduct of both parties during performance also demonstrates that the presence of camping units throughout the year is part of seasonal/non-transient camping and the Lease.[8] The St. Louis District has had full knowledge of Sullivan Marina's annual pricing, and has accepted its share of the rent, under Section 2 of the Lease, based upon an annual rate for full hook-up sites without

---

[8] Also, it should be noted that Fox Harbor, as Sullivan Marina, was formerly known, offered seasonal/non-transient camping to its customers. This practice was continued by Sullivan Marina under its lease, and this fact has been acknowledged in correspondence by the St. Louis District. (<u>See</u> Exhibit I, letter to Commander Mississippi Valley Division dated June 2, 2000.)

objection. Indeed, it was not until July 1998 that the St. Louis District began to assert that seasonal/non-transient camping and storage were not approved activities. (See Exhibit H, July 30, 1998 Report of Compliance Inspection.) By this time the Lease had been in place for three years. Indeed, "one may not ignore the interpretation and performance of a contract, whether termed 'mistake' or not, before a dispute arises." Alvin, Ltd v. United States Postal Serv., 816 F.2d 1562 (Fed. Cir. 1987) (holding that government's payment of special use taxes during early years of lease demonstrated intent of the contract even though such terms were not specifically included in the contract).

The St. Louis District's objection to the presence of camping units throughout the year was based upon the fact that approval had not been obtained from Division. This is a paradoxical position at best because, given the inclusion of seasonal/non-transient camping in the NOA and the Use and Development Plan, and the St. Louis District's knowledge of Sullivan Marina's reliance on seasonal/non-transient camping for its profitability, it had an affirmative duty to obtain the necessary approvals from Division to fulfil its implied duty to cooperate. See Precision Pine & Timber, Inc. v. United States, 50 Fed. Cl. 35, 54 (2001) (holding that "there can be little doubt that the implied duties to cooperate and not to hinder are read into contracts with the Federal Government and are binding on the parties as if they were expressly written into the contract"); Abcon Assoc. Inc. v. United States, 49 Fed.Cl. 678, 688 (2001) (holding that a contractor need not prove bad faith, "instead, plaintiff can satisfy its burden by proving a lack of diligence or failure to cooperate in the other party's performance"); Nanofast, Inc., ASBCA No. 12545, 69-1 BCA 7566 (holding that there is an implied affirmative obligation on the part of the Government, to do whatever is necessary to allow the contractor to perform). In any event, the Mississippi Valley Division's approval for seasonal/non-transient camping was obtained on June 21, 2000, curing the District's failure to do so earlier, and ratifying the inclusion of seasonal/non-transient camping as part of the Lease.

Most importantly, St. Louis District has formally acknowledged in writing that it interprets Sullivan Marina's contractual rights to include "storage of camping units (i.e. trailers and recreational vehicles) ***as provided for*** in the Commercial Concession Lease for Sullivan Marina, L.L.C., Contract Number DACW43-1-95-17." (emphasis added.) (See Exhibit K, letter to Sullivan Marina dated June 28, 2000.) Thus, both parties have interpreted seasonal camping and non-transient trailer sites to include the presence of camping units throughout the year and there is no question that it is part of the Lease.

The St. Louis District has failed to take account of the fact that the Lease does not give it the specific contractual authority to essentially revoke seasonal/non-transient camping as it is currently practiced by Sullivan Marina. The St. Louis District has cited §20 of the Lease as the source of its authority in this regard. However, §20 simply does not give the St. Louis District the ability to unilaterally rescind a contractual right. The Lease provides that "[f]ailure to satisfactorily correct any substantial or persistent non-compliance within the specified time" is grounds for: (1) "closure of all or part of the premises"; (2) "temporary suspension of

operation"; or, (3) "revocation of the Lease, after notice in writing of such intent." The St. Louis District has not purported to close all or part of the premises, to temporarily suspend operations, or to revoke the Lease. Rather, it has unilaterally modified the terms of the Lease, and is no longer allowing Sullivan Marina to offer the full scope of seasonal/non-transient camping. Section 37 of the Lease clearly prohibits such a unilateral modification. (See Exhibit F, Lease § 37.) Hence, the Lease does not provide authority for the actions taken by the St. Louis District.

Based upon these considerations, the St. Louis District's arbitrary and capricious revocation of camping storage rights is a clear breach of contract taken without authority. These damages will begin to accrue on or before November 1, 2004, and will continue until the end of the Lease's term. Deprived of their ability to store camping units during the off-season, it is very likely that many customers simply will not return. Often, customers do not have the means to store camping units at their residences, or to transport their camping units in the first place, and it is very likely that many will seek other campgrounds outside the Lake Shelbyville area that allow camping units to be present throughout the year. If these customers also rent slips, then Sullivan Marina's damages will be compounded if they do not return.

The Army Corps of Engineer's own regulations state that the underlying purpose of commercial concession leasing "will be achieved only when the concessionaire has an opportunity to make a fair profit." ER 405-1-12, Paragraph 8-157.a. Clearly, if the St. Louis District does not reverse its January 30, 2004 revocation, Sullivan Marina's ability to earn a fair profit will be undermined. Sullivan Marina reserves its right to seek any damages that may result from the St. Louis District's revocation of camping unit storage.

C. <u>The Lease does not prohibit the storage of boats near the entrance to the campground and marina.</u>

It has been Sullivan Marina's practice for many years to store large boats on the concrete area near the entrance to the marina and campground. Moreover, it is common practice for the other two marinas in the area to store large boats on available hard surface. This is because large boats require hard, level surfaces for storage due to the fact that they can sink in to the soil and cause substantial turf damage in unpaved areas. Moreover, the weight of large boats makes ingress and egress to and from unpaved storage areas difficult and impractical, particularly in wet weather. Finally, large boats that require blocking can become unstable if not stored on a hard, flat surface, and can present a safety hazard, due to the risk of tipping, if stored on uneven, soft ground.

While it is true that the Lease was amended to provide a storage area, the language of the amendment describes how the area will be used, and does not affirmatively state that all boats must be stored in that area. (See Exhibit U, Lease Modification dated February 16, 2000.) The additional storage was needed because Sullivan Marina was adding new camping sites, which reduced the available space for the storage of campers' boats. Indeed, an amendment was only

necessary because additional land was actually added to the leasehold, not to approve boat storage. In fact, large boats were stored on the concrete area well before the Lease was amended on February 16, 2000.

In denying Sullivan Marina's request to store boats in this area, the St. Louis District makes reference to the fact that the storage area could be paved to accommodate larger boats. (See Exhibit V, letter to Sullivan Marina dated March 17, 2004.) However, given that a suitable paved area is already available, there is no reason to require this substantial and ultimately unnecessary investment on the part of Sullivan Marina. Approval for the continued storage of boats on the paved area that already exists does not violate any terms of the Lease, and is clearly supported by the implied duty of cooperation. See generally Precision Pine & Timber, Inc. v. United States, 50 Fed. Cl. 35, 54 (2001); Abcon Assoc. Inc. v. United States, 49 Fed.Cl. 678, 688 (2001); Nanofast, Inc., ASBCA No. 12545, 69-1 BCA 7566.

## IV. CONCLUSION

Pursuant to § 33 of the Lease, and the Contract Disputes Act, Sullivan Marina requests that the St. Louis District reverse its January 30, 2004 decision regarding seasonal/non-transient camping, and that a final decision be rendered on this matter within sixty (60) days. In addition, Sullivan Marina requests that a final decision with respect to the storage of large boats on the paved area near the entrance to the marina and campground within the same sixty (60) day period.

Please feel free to contact us should you have any questions. Thank you in advance for your prompt attention to this matter.

Very truly yours,

Thompson Coburn LLP

By
Timothy F. Noelker
A. Ben Foster

ABF/kmj

cc: Jeff Asbed

2263311